**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:10CR-43-R**

UNITED STATES OF AMERICA                                   PLAINTIFF

vs.

JOHN BABB                                                           DEFENDANT

## MEMORANDUM OPINION AND ORDER

A suppression hearing was held on March 3, 2011.  A continuation of that suppression

hearing was held on March 30, 2011, at the request of the parties.  A post-hearing motion in

support of suppression was filed by the Defendant (DN 53).  A post-hearing motion contesting

suppression was filed by the government (DN 56).  A reply to the government's motion was filed

by the Defendant (DN 57).  This matter is ripe for review.  For the reasons that follow, the

motion to suppress is DENIED.

## BACKGROUND

Defendant, John Nathaniel Babb, was wanted for a federal warrant and multiple alleged

state warrants.  The activity resulting in the warrants occurred in or around Spartanburg County,

South Carolina.  However, when the Spartanburg County Police Department tried to arrest Babb,

they learned that he had traveled to Myrtle Beach, South Carolina.  Spartanburg County Police

contacted the police department located at Myrtle Beach in an attempt to get them to arrest Babb

on behalf of Spartanburg County.  By the time the Myrtle Beach police went to arrest Babb, he

had already left the area.

A witness in Spartanburg County provided a suspected address for Babb at the Extended

Stay Motel in Jeffersontown, Kentucky.  After obtaining this information, Secret Service Agent

Iris Joliff and Spartanburg County Police Department Investigator Reid Lindsey discussed the

best means of apprehending Babb. Agent Joliff stated that she would contact the Secret Service field office in Louisville, Kentucky and see if an agent in that area could arrest Babb. Agent Joliff and Investigator Lindsey decided that Investigator Lindsey and Sergeant Kevin Bobo, also of the Spartanburg County Police Department, would travel to Jeffersontown in an attempt to enlist the help of the local police department in arresting Babb and to help in the identification of Babb[1] and his vehicle.[2] Bobo and Lindsey left for Jeffersontown that day, and arrived in the early morning on August 30, 2009, perhaps around 12:30 or 1 a.m.

Upon arriving in Jeffersontown, Kentucky, Bobo and Lindsey first visited Babb's suspected location. Babb's vehicle was not present, and Bobo and Lindsey continued on to the Jeffersontown police station. At the station, Bobo and Lindsey checked in with the officer on duty. They explained that Babb was wanted on both state and federal charges and provided some documentation, though neither Bobo nor Lindsey remember exactly what documentation was provided. Jeffersontown police confirmed that there was an active arrest warrant. Bobo and Lindsey asked that the department keep a lookout for Babb's car throughout the night. Bobo and Lindsey then went to a motel room and slept for a few hours.

Sometime during the morning hours, Bobo and Lindsey once again drove by Babb's suspected location. Upon noticing Babb's vehicle, Bobo and Lindsey parked at a nearby

---

[1]Joliff and Lindsey had reason to believe that Babb may have been traveling under a different name. Accordingly, having officers familiar with Babb may have helped with the execution of the warrant.

[2]Lindsey testified that practices like this were routine, as a situation was more likely to be treated as urgent if an officer traveled in person to request aid than if an officer merely contacted another department to request aid. Lindsey stated that he had both visited foreign jurisdictions on other occasions and aided officers that had traveled in person to his jurisdiction on other occasions.

convenience store and phoned the Jeffersontown Police Department. They reported Babb's presence to the police, and stayed by the convenience store to observe the vehicle.

At some point, the Jeffersontown police arrived on the scene.[3] They spoke with hotel employees and obtained a key to Babb's room. The police arrayed themselves outside of Babb's room and knocked on his door. Babb answered the door and surrendered to police. Babb was placed into handcuffs. At this point, Babb's testimony and the Officers' testimony diverges sharply.

### 1. Testimony by the Officers

According to the various police officers, Babb was detained and the officers performed a safety search of Babb's person and a safety sweep of Babb's hotel room. At some point, Babb also consented to a search of his hotel room. The officers noticed computers and other electronic media in plain view, and because Babb was wanted for fraud charges, these electronics were collected as evidence. While Babb was detained, Bobo and Lindsey walked over. Babb reacted to their presence by yelling and resisting the Jeffersontown police officers. To avoid making the situation any more dangerous, Bobo and Lindsey removed themselves from the scene. Bobo and Lindsey stepped into Babb's hotel room and glanced around. However, they did not participate in the search of the room or in gathering any evidence.

Also around the same time, the arresting officers contacted their dispatcher. The dispatcher once again pulled up Babb's NCIC report. Upon seeing the active warrants from Spartanburg County, the dispatcher faxed a document to the Spartanburg County Police

---

[3]There is a dispute as to whether the police arrived on the scene around 9 a.m. or around 11 a.m.

Department which was needed to verify that the Spartanburg County Police Department would extradite Babb.  When a response was slow in coming, the dispatcher contacted the Spartanburg County Police Department.  The Spartanburg County Police Department verified that they would extradite Babb on his active warrants, and that they were preparing the appropriate paperwork, including copies of the South Carolina warrants.  At some point, the Jeffersontown Police Department also contacted Agent Joliff, who verified the federal warrant and directed them to contact Agent Nord.

Sometime that morning, Agent Joliff contacted Agent Nord to ask for his help in acquiring Babb.  Nord was traveling to Jeffersontown when the Jeffersontown police contacted Nord, at the direction of Agent Joliff, to inquire as to what they should do with Babb.  Nord stated that he was currently on his way to pick up Babb.

At some point, the Jeffersontown Police Department intended to transport Babb back to the police station.  However, after talking with Nord, it was determined that the exchange should occur at the location of Babb's arrest.  Nord arrived at the scene and took Babb into custody.  Babb did not look like he had been assaulted.  Nord transported Babb back to the Louisville field office, likely accompanied by Sergeant Bobo.[4]  Upon arriving, Babb was placed into an interrogation room and consented to the search of the computers and other electronic media seized during his arrest.

### 2. Testimony by Babb

Babb states that, after his arrest, Lindsey and Bobo left their vehicle and joined the

---

[4]Nord testified that "we" transported Babb, but the testimony never makes clear what the "we" refers to.  March 3, 2011 Hearing Transcript, DN 48 pg. 133.  Lindsey testified that Bobo accompanied Nord back and Lindsey followed in their car from Spartanburg.  *Id.* at 62.

Jeffersontown police officers.  Lindsey then proceeded to assault Babb, leaving him with multiple cuts and bruises.  Officers then searched Babb's hotel room and vehicle, discovering multiple electronic devices.[5]  At some point, Babb was placed into a police cruiser and taken to the Jeffersontown police station.  There, a nurse cleaned Babb up and Babb was then taken back to the location at which he was detained.  Control of Babb was then transferred to Agent Nord. Agent Nord and Sergeant Bobo drove back to the Secret Service Louisville field office, and Investigator Lindsey followed behind with the car Bobo and Lindsey had taken from South Carolina.  Once in Louisville, Nord, Bobo and Lindsey took Babb to an interrogation room. Nord extracted a consent to search from Babb by threatening to bring charges against Babb's mother if Babb did not sign the form.  At that point, Babb signed the form with some handwritten caveats.

### 3. Forensic Examination of the Electronics

The electronic media collected as evidence was maintained at the Louisville Field Office when Babb was extradited to South Carolina.  This is due to the fact that the Secret Service had facilities and agents at the Louisville location to conduct a forensic examination of electronic media and such resources were not available at the Greenville Field Office.  Babb pled guilty to his charges in late 2009.  In early 2010, the forensic examination of Babb's computer was completed.  The examination was done using a kit that is commonly used by the Secret Service. The kit indexes the computer and allows the examining agent to quickly browse through the files looking for evidence.

---

[5]Babb claims his iPhone was confiscated from him, never returned and has since disappeared from Secret Service custody.

At some point, the agent conducting the examination set the kit to allow him to look through images on the computer. The agent did this to look for images of altered checks or other evidence of fraud. While browsing through these images, the agent encountered an image that he thought was child pornography. The agent immediately ceased his search of the computer and contacted Nord. Based on the evidence seen, Nord obtained a search warrant to examine the computer specifically for child pornography. The examining agent encountered child pornography during this subsequent search performed according to the warrant.

## STANDARD

The Fourth Amendment was established to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV*; see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). An arrest is reasonable under the Fourth Amendment if there has been execution of an arrest warrant or there is probable cause that the defendant has committed a crime. *Devenpeck,* 543 U.S. at 152.

## DISCUSSION

As an initial matter, Defendant contends that the original suppression motion included an argument that the search of Defendant's computers exceeded Defendant's consent. While such a theory was not the focus of the suppression hearing, enough facts are available to allow the Court to resolve this issue.

Defendant consented to having his computers searched for evidence of bank fraud. Part of a forensic examination for bank fraud involves browsing through images on the computer looking for fraudulent check images. Transcript of March 3, 2011 hearing, DN 48, pg. 168. In the process of viewing these images searching for checks, the forensic examiner encountered an

image he suspected was child pornography.  *Id.*  The examiner immediately stopped his search.  *Id.* at 169.  A search warrant was obtained to search specifically for child pornography based on the image seen in plain view.  *Id.*; *see e.g.*, *United States v. Lucas*, --- F.3d ----, 2011 WL 1775685 (6th Cir. 2011); *United States v. Underwood*, 2010 WL 5313766 (W.D.Ky. Dec. 20, 2010); *United States v. Williams*, 592 F.3d 511, 521-22 (4th Cir. 2010).  Accordingly, the scope of the consent was never exceeded.

Defendant's second ancillary contention is that he revoked his consent prior to the discovery of the child pornography.  All of the Secret Service officers testified that they were never aware of Defendant revoking his consent.  In addition, Defendant has provided no evidence that he revoked or attempted to revoke his consent.  Defendant argues that, because he pled guilty prior to the search, his consent was implicitly revoked.  However, the Secret Service agents testified that it was in their regular practice to continue to investigate crimes after a guilty plea.  Such investigation could be used to aid in sentencing, uncover accomplices, or uncover additional charges.  Accordingly, there is no merit to the contention that Babb revoked his consent or that consent was implicitly revoked after Babb pled guilty to the underlying charges.

Defendant's primary contention is that Defendant was arrested without a warrant or without probable cause, and that any consent to search is therefore fruit of the poisonous tree.  As above, this argument must fail.  It seems clear that there was at least one active state warrant and one active federal warrant at the time Babb was arrested - both of which were known by the Jeffersontown officers.

While Babb's overwhelming number of state charges makes it difficult to keep track of which documents refer to which charge, there is a wealth of evidence that at least one charge was

active.  Lindsey and Bobo both testified that there was at least one active state charge when they traveled to Kentucky to streamline Babb's arrest.  Once Lindsey and Bobo arrived in Kentucky, they informed the Jeffersontown officers of both the state and federal warrants.  While neither officer could remember if they brought any supporting documentation, the Jeffersontown police department confirmed that there was an active warrant on NCIC.  Since it is undisputed that the federal warrant was not entered into the NCIC database, the active warrant must have been the result of a South Carolina warrant.  The active warrant allowed the Jeffersontown police to effectuate a lawful arrest of Babb.

After Babb's arrest, the Jeffersontown department then reconfirmed the warrant on NCIC, which still indicated an active warrant for Babb's arrest.  The Department contacted the Spartanburg County Police Department in South Carolina to confirm an active warrant and to confirm that South Carolina would extradite Babb.  The Spartanburg County Police Department confirmed an active warrant and confirmed that they would extradite Babb.  On the recording made by the Jeffersontown Police Dispatcher, the Spartanburg County Police Department can be heard giving clear verbal confirmation as to the existence of the state warrant and their willingness to extradite if necessary.

Next, the Jeffersontown Police Department checked in with the Secret Service, the agency that had a federal warrant for Babb's arrest.  Since the federal warrant was not on NCIC, the only way the Jeffersontown police could have been aware of the warrant at that point was if Bobo or Lindsey informed them.  The department originally called Agent Joliff, who confirmed that there was an active federal warrant for Babb's arrest.  Agent Joliff then directed the Jeffersontown police to Agent Nord, who was based out of the Secret Service Louisville field

office.  The Jeffersontown Police contacted Agent Nord as he was traveling to Jeffersontown.  Upon his arrival, Agent Nord took custody of Babb under the federal warrant.

The evidence in this case makes it clear that there was an active state warrant.  Most convincing, the Jeffersontown dispatcher called up the Spartanburg County Police Department.  The Spartanburg County Police Department verbally verified that there was, in fact, an active warrant and that South Carolina would extradite Babb.  Since there is no allegation or evidence that the tape was manufactured, the Defense has failed to overcome this evidence.  Additionally, all officers involved testified that there was an active and verified South Carolina warrant.

Similarly, the evidence makes it clear that there was an active federal warrant.  While there is no evidence that the Jeffersontown Police Department obtained verification of the federal arrest warrant prior to the arrest independent of the report made by Bobo and Lindsey,[6] there is no challenge to the validity of the federal warrant.  While a failure to verify a warrant prior to an arrest may be sufficient to overcome a good faith defense in the event that the warrant did not actually exist, this Court could find no precedent, and none was cited by the Defendant, requiring additional verification of a warrant prior to effectuating an arrest such that the suppression of evidence is necessary when there is, in fact, a valid arrest warrant.

Even assuming, *arguendo*, that there was no valid state warrant, the arrest and consent to search following the arrest are still valid.  Defendant has never contested the validity of the federal warrant.  The Jeffersontown police had been informed of the existence of a federal warrant.  While they may have failed to confirm that warrant prior to the arrest, if they

_____

[6]Given the active state warrant that was confirmed, this step likely seemed redundant and unnecessary.

subsequently found out that the South Carolina warrant they did confirm was invalid, they had "reasonable grounds to be suspicious that there might be a warrant outstanding against the defendant." *United States v. Gross*, 624 F.3d 309, 320 (6th Cir. 2010). Accordingly, a continued detention of Babb to verify the federal warrant was reasonable. *Id.* Once verified, Babb was certainly subject to arrest under the federal warrant and the consent to search incident to the arrest was valid.

Defendant argues that this Court must apply the good faith analysis established in *Leon*. As discussed above, however, Babb was lawfully arrested pursuant to a valid warrant. Accordingly, it is unnecessary to reach a good faith analysis.

Babb's detention and arrest were lawful and the subsequent search was conducted with his consent. The images of child pornography were in plain view when conducting the search to which Babb consented, and a search warrant was obtained to specifically allow the examiner to search for child pornography following the initial observance. Accordingly the motion to suppress is DENIED.

## CONCLUSION

For the foregoing reasons, the motion to suppress (DN 28) is DENIED.